ACCEPTED
01-14-00904-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
3/5/2015 11:42:14 AM
CHRISTOPHER PRINE
CLERK

## NO. 01-14-00904-CV

---

## IN THE FIRST COURT OF APPEALS
## HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
3/5/2015 11:42:14 AM
CHRISTOPHER A. PRINE
Clerk

Void K

---

## GRAMERCY ADVISORS LLC, GRAMERCY ASSET MANAGEMENT LLC, GRAMERCY LOCAL MARKETS RECOVERY FUND LLC, AND GRAMERCY FINANCIAL SERVICES LLC, *Appellants*

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

3/5/2015 11:42:14 AM

CHRISTOPHER A. PRINE
Clerk

v.

## R.K. LOWRY, JR., ET AL., *Appellees*.

---

Interlocutory Appeal from the 80th Judicial District Court, Harris County, Texas
Cause No. 2008-74262

---

## APPELLEES' BRIEF

---

David R. Deary, State Bar No. 05624900
W. Ralph Canada, Jr., State Bar No. 03733800
Wilson E. Wray, State Bar No. 00797700
Tyler M. Simpson, State Bar No. 24066091
LOEWINSOHN FLEGLE DEARY LLP
12377 Merit Drive, Suite 900
Dallas, Texas 75251
Telephone: (214) 572-1700
Facsimile: (214) 572-1717
davidd@lfdlaw.com
ralphc@lfdlaw.com
wilsonw@lfdlaw.com
tylers@lfdlaw.com

## IDENTITIES OF PARTIES AND COUNSEL

**Appellants** – Gramercy Advisors LLC, Gramercy Asset Management LLC, Gramercy Local Markets Recovery Fund LLC, Gramercy Financial Services LLC

David C. Mattka (lead attorney)
MUNSCH HARDT KOPF & HARR, P.C.
401 Congress Avenue, Suite 3050
Austin, Texas 78701
(512) 391-6100 (telephone)
(512) 391-6149 (fax)
dmattka@munsch.com

Sean O'Shea (*pro hav vice*)
Michael E. Petrella (*pro hav vice*)
Daniel M. Hibshoosh (*pro hav vice*)
O'SHEA PARTNERS LLP
521 Fifth Avenue, 25th Floor
New York, New York 10175
(212) 682-4426 (telephone)
(212) 682-4437 (fax)

**Appellees** - R.K. Lowry, Jr.; L-Falling Creek LLC; Russell A. Chabaud; R-RAC Wimbledon LLC; John P. Moffitt; J-Jason LLC; Russell A. Chabaud, Trustee of the Russell G. Chabaud 1999 Investment Trust, R-Russell Wimbledon LLC; Russell A. Chabaud, Trustee of the Ashley Chabaud 1999 Investment Trust, R-Ashley Wimbledon LLC; Russell A. Chabaud, Trustee of the Audrey Chabaud 1999 Investment Trust, R-Audrey Wimbledon LLC; LMC Recovery Fund LLC, Union Gas Funding I, L.P.; RanA Holdings LLC, Westy I LLC, MOGI LLC

W. Ralph Canada, Jr. (lead counsel)
David R. Deary
Wilson E. Wray
Tyler M. Simpson
Jim L. Flegle (trial counsel)
Jeven R. Sloan (trial counsel)
LOEWINSOHN FLEGLE DEARY, LLP
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 (telephone)

## TRIAL COURT

Hon. Larry Weiman
80th Judicial District Court
Harris County, Texas

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................... i

TABLE OF AUTHORITIES ........................................................................... iv

STATEMENT REGARDING ORAL ARGUMENT ........................................... vii

RECORD REFERENCES ............................................................................. viii

ISSUES PRESENTED................................................................................... ix

STATEMENT OF FACTS ...............................................................................1

I.     Overview of the tax shelter scheme to defraud Texas Appellees ...................1

II.    Gramercy marketed the Investment Strategies to Appellees a meeting
in Texas.............................................................................................4

III.   Gramercy entered into investment management agreements with
Appellees to act as Appellees' attorney-in-fact...............................8

IV.   Gramercy's contacts regarding the 2000 Digital Options Strategy.................9

V.    Gramercy's contacts regarding the 2001-2003 Distressed Debt
Strategies..........................................................................................14

      A.    The 2001 Distressed Debt Strategy .....................................14

      B.    The 2002 Distressed Debt Strategy .....................................17

      C.    The 2003 Distressed Debt Strategy .....................................19

VI.   At a meeting in Texas, Gramercy marketed a new distressed debt
strategy to Appellees in 2003 ..........................................................21

VII.  Gramercy's contacts regarding the 2004-2005 Distressed Debt
Strategy ............................................................................................24

      A.    The 2004 Distressed Debt Strategy .....................................24

      B.    The 2005 Distressed Debt Strategy .....................................26

VIII. Gramercy marketed related investments to Appellees in Texas, sent monthly account statements and emails to Appellees in Texas, and invited Appellees to participate in regular conference calls..........................26

IX. Gramercy aided Appellees in responding to the IRS audit by forwarding IRS audit notices to Texas and wiring payments to Texas law firms from Gramercy-managed bank accounts ......................................28

X. The trial court denied Gramercy's special appearance ................................29

SUMMARY OF THE ARGUMENT ...................................................................29

STANDARD OF REVIEW .................................................................................30

ARGUMENT .......................................................................................................31

I. Law governing Gramercy's Special Appearance ..........................................31

II. Gramercy purposefully directed actions at Texas that are substantially connected to the allegations in this case ........................................................33

    A. Gramercy crossed a "bright line" by marketing the Investment Strategies and making misrepresentations to Appellees at meetings in Texas..........................................................................33

    B. Gramercy's meeting in Texas are substantially connected to the Investment Strategies ........................................................................40

    C. Gramercy drafted, negotiated, and entered into numerous contracts with Texas-resident Appellees contemplating a long-term relationship with performance occurring at least in part in Texas ...........................................................................................44

    D. Gramercy directed preparation of tax documents related to the Investment Strategies and delivered the documents to Texas ............48

    E. Gramercy made millions of dollars from its Texas contacts through fees generated by the investment management agreements and undisclosed kick-backs from BDO ...........................50

    F. Gramercy communicated regularly with Appellees in sent monthly account statements to Appellees in Texas, set up a secure website for Appellees to view account information, and

invited Appellees to participate in quarterly conference calls from Texas ................................................................................51

G. Gramercy managed entities—majority owned by Texans—involved in the Investment Strategies .................................................53

III. The cases cited by Gramercy do not apply to this case involving numerous face-to-face meetings in Texas initiated by Gramercy .................55

IV. Exercising personal jurisdiction over Gramercy will not offend traditional notions of fair play and substantial justice ..................................57

CONCLUSION AND PRAYER ..........................................................................58

CERTIFICATE OF COMPLIANCE.....................................................................60

CERTIFICATE OF SERVICE ............................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Preferred Servs., Inc. v. Harrison*,
No. 07-11-0065-CV, 2011 WL 4485463 (Tex. App.—Amarillo
Sept. 28, 2011, no pet.) ..............................................................45, 49, 55

*BMC Software Belgium, N.V. v. Marchand*,
83 S.W.3d 789 (Tex. 2002)...................................................30, 31, 36

*Bozell Grp., Inc. v. Carpet Co-op of Am. Ass'n, Inc.*,
No. 00 CIV. 1248, 2000 WL 1523282 (S.D.N.Y. Oct. 11, 2000)................55, 56

*Cartlidge v. Hernandez*,
9 S.W.3d 341 (Tex. App.—Houston [14th Dist.] 1999, no pet.) .......................52

*Citrin Holdings v. Minnis*,
305 S.W.3d 269 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ............*passim*

*Crithfield v. Boothe*,
343 S.W.3d 274 (Tex. App.—Dallas 2011, no pet.) ..........................................33

*Daimler-Benz A.G. v. Olson*,
21 S.W.3d 707 (Tex. App.—Austin 2000, pet dism'd)...............................52, 53

*Farwah v. Prosperous Mar. Corp.*,
220 S.W.3d 585 (Tex. App.—Beaumont 2007, no pet.) ..............................55, 56

*GE v. Brown & Ross Int'l Distribs., Inc.*,
804 S.W.2d 527 (Tex. App—Houston [1st Dist.] 1990, writ
denied)...........................................................................................................31

*Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*,
815 S.W.2d 223 (Tex. 1991) ..........................................................................33

*Gustafson v. Provider HealthNet Servs., Inc.*,
118 S.W.3d 479 (Tex. App.—Dallas 2003, no pet.) ....................................55, 56

*Horizon Shipbuilding, Inc. v. Blyn II Holding, LLC*,
    324 S.W.3d 840 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ............*passim*

*Hotel Partners v. Craig*,
    993 S.W.2d 116 (Tex. App.—Dallas 1998, pet. denied)..............................55, 56

*IRA Res., Inc. v. Griego*,
    221 S.W.3d 592 (Tex. 2007) ................................................................................55

*Johns Hopkins Univ. v. Nath*,
    238 S.W.3d 492 (Tex. App.—Houston [14th Dist.] 2007, pet.
    denied)...................................................................................................................30

*Kelly v. Gen. Interior Const., Inc.*,
    301 S.W.3d 653 (Tex. 2010) .........................................................................32, 33

*Lang v. Capital Res. Investments, I, LLC*,
    102 S.W.3d 861 (Tex. App.—Dallas 2003, no pet.) ....................................55, 56

*Magnolia Gas Co. v. Knight Equip. & Mfg. Corp.*,
    994 S.W.2d 684 (Tex. App.—San Antonio 1998) .......................................55, 57

*Marathon Oil v. A.G. Ruhrgas*,
    182 F.3d 291 (5th Cir. 1999) ........................................................................55, 56

*In re Martinez*,
    564 F.3d 719 (5th Cir. 2009) .............................................................................21

*Max Protetch v. Herrin*,
    340 S.W.3d 878 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ............*passim*

*Michiana Easy Livin' Country, Inc. v. Holten*,
    168 S.W.3d 777 (Tex. 2005) ........................................................................*passim*

*Moki Mac River Expeditions v. Drugg*,
    221 S.W.3d 569 (Tex. 2007) .........................................................................31, 40

*Moncrief Oil Int'l v. OAO Gazprom*,
    414 S.W.3d 142 (Tex. 2013) .......................................................................*passim*

*Peters v. Top Gun Executive Group*,
    396 S.W.3d 57 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ....................52

v

*Proskauer Rose LLP v. Pelican Trading, Inc.*,
    2009 WL 242993 (Tex. App.—Houston [14th Dist] Feb. 3, 2009,
    no pet.) ..................................................................................................55, 56

*Retamco Operating, Inc. v. Republic Drilling Co.*,
    278 S.W.3d 333 (Tex. 2009) ........................................................................33

*Smart Call, L.L.C. v. Genio Mobile*,
    349 S.W.3d 755 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ...................44

*TexVa, Inc. v. Boone*,
    300 S.W.3d 879 (Tex. App.—Dallas 2009, pet. denied)...................................53

*Turan v. Universal Plan Inv. Ltd.*,
    70 F. Supp. 2d 671 (E.D. La. 1999)..........................................................55, 56

*Xenos Yuen v. Fisher*,
    227 S.W.3d 193 (Tex. App.—Houston [1st Dist.] 2007, no pet.).....................31

## Statutes

TEX. CIV. PRAC. & REM. CODE § 17.041-.042 .......................................................31

## Other Authorities

TEXAS RULE OF APPELLATE PROCEDURE 6.3 and 9.5(b), (d), (e) ............................61

TEXAS RULE OF APPELLATE PROCEDURE 9.4(i)(1)...................................................60

TEXAS RULE OF APPELLATE PROCEDURE 9.4(e)......................................................60

TEXAS RULES OF APPELLATE PROCEDURE 38, 39................................................. vii

## STATEMENT REGARDING ORAL ARGUMENT

Under Rules 38 and 39 of the Texas Rules of Appellate Procedure, Appellees believe there are no complicated questions of fact or of law, and the parties have thoroughly briefed the issues, so that oral argument should be unnecessary.

# RECORD REFERENCES

CR – Clerk's Record

RR – Reporter's Record

## ISSUES PRESENTED

1.      Did the trial court err in denying Gramercy's special appearance when the record establishes that Gramercy marketed tax-reducing investment strategies to Appellees at meetings in Texas, at which Gramercy made misrepresentations regarding those strategies and the underlying investments, and made numerous other contacts with Texas substantially related to the investment strategies?

# STATEMENT OF FACTS

## I. Overview of the tax shelter scheme to defraud Texas Appellees

This lawsuit involves complex, tax-reducing investment strategies (sometimes referred to as "Investment Strategies") designed, developed, promoted, sold, and implemented in a scheme to defraud Appellees—all of whom are Texas residents. CR 95-96. Contrary to Gramercy's position that it acted purely as an investment advisor without regard to the tax consequences of the Investment Strategies, the facts show that Gramercy actively participated in the design, development, marketing, sale, and implementation of all aspects of the Investment Strategies. *See, e.g.,* CR 95-96, 2086-2106. Together, Defendant BDO Seidman ("BDO") and Gramercy designed the Investment Strategies to provide tax benefits through investments in (1) digital option contracts on foreign currency purchased and coordinated by Gramercy and (2) distressed debt funds established, managed, and coordinated by Gramercy. CR 122-23, 141-42.

Through undisclosed and illegal business arrangements, BDO and Gramercy systematically identified wealthy potential or existing clients facing substantial capital gains or income taxes. CR 97. Appellees—successful oil and gas businessmen but inexperienced and unsophisticated with respect to tax law and investments outside of oil and gas—were among these clients. CR 117-22; 426, 1107, 1123, 2085.

1

During meetings in Texas, BDO and Gramercy marketed the Investment Strategies to Appellees as smart investments that would provide the potential of high returns and at the same time would, regardless of the investment outcome, minimize capital gains and income tax obligations. CR 97-98; 427-28, 1109, 1124, 2087. In reality, the Investment Strategies were purely a means to unlawfully exact millions of dollars in fees and commissions from Appellees. CR 96. BDO and Gramercy knew or should have known that the Investment Strategies would not and could not yield the investment returns or tax treatments claimed and were, in fact, illegal tax shelters. CR 96-97, 99, 100, 104-19. At the time they promoted and sold the Investment Strategies to Appellees, BDO and Gramercy knew that federal authorities were investigating the legality of similar abusive tax shelters. CR 96-97. Nevertheless BDO and Gramercy told Appellees the Investment Strategies were sound investments and a legal means of reducing their tax liability. CR 96, 98, 107, 118-20, 428-29, 1109-10, 1125, 2087-88.

The federal government successfully prosecuted many of the players in this tax shelter scheme:

- In June 2012, BDO entered into a Deferred Prosecution Agreement with the United States Attorney's Office in which it admitted that its personnel had engaged in unlawful and fraudulent conduct involving tax shelters like the ones sold to Appellees. CR 454-96. BDO paid a $34.4 million fine in connection with its Deferred Prosecution Agreement. CR 455, 496.

2

- Four former BDO partners pled guilty to conspiracy to defraud the United States and tax evasion concerning abusive tax shelters similar to the Investments Strategies.  CR 97-98, 498-678.

- Defendant Sidley Austin settled with the IRS for $39.4 million for its role in promoting and implementing abusive tax shelters like the Investment Strategies.  CR 99-100, 841.

- R.J. Ruble, a former Sidley Austin lawyer, pled guilty to conspiracy to defraud the United States and tax evasion concerning abusive tax shelters similar to the Investments Strategies.  CR 99-100, 761-839.

Once Appellees were "hooked" into the scheme by Gramercy and BDO, Gramercy implemented the investment portion of the scheme.  *See, e.g.*, CR 119-20, 141-45.  To accomplish this, Gramercy sent numerous contracts and communications to Appellees in Texas and, in some cases, brought and discussed contracts at meetings in Texas.  *See, e.g.,* CR 2086-2106.  Sidley Austin and De Castro West, acting as co-conspirators, issued legal opinion letters attesting to the legality of the Investment Strategies.  *See, e.g.*, CR 99-102, 121, 134-38.  These law firms, as well as Gramercy and BDO, knew their legal opinion letters were false when written and were written with the intent to defraud Appellees.  *Id.*

Gramercy directed and oversaw the preparation of tax returns and Schedule K-1s for the entities owned by Appellees involved in the Investment Strategies and delivered those tax documents to Appellees in Texas.  CR 100-01, 138, 149, 156, 165, 175, 2092-93, 2096-2100, 2103-04, 2325-45, 2688-2785, 2786-2837, 3004-76, 3465-3530.  Ultimately, the IRS audited the tax returns prepared at the request of

Gramercy, resulting in the imposition of penalties, interest, and back taxes on Appellees. CR 158, 167.

## II. Gramercy marketed the Investment Strategies to Appellees a meeting in Texas

In June 2000, the individual Appellees—Lowry, Chabaud, and Moffitt—received substantial proceeds from the sale of certain oil and gas properties. CR 117, 426, 1107, 1123, 2085. Following the sale, Lowry, Chabaud, and Moffitt asked their business advisors to look for reputable investment advisors who could help find investments to diversify their holdings and increase their returns. *Id.* A friend of Chabaud recommended that Appellees meet with BDO. CR 117, 426. In September 2000, Defendant Randy Moorman, a tax partner in BDO's Houston office, contacted Appellees' personal accountant, Newt Vannaman, to set up a meeting with Appellees. CR 117, 2086.

Subsequent to this initial meeting—but before Appellees agreed to the Investment Strategy—Appellees and their advisors met with Gramercy's representative, Defendant Jay Johnston, and BDO's Paul Shanbrom and Randy Moorman at Appellees' offices in Houston to discuss the Investment Strategies in detail. CR 120-22, 320, 427, 1108, 1124, 2086-87. Johnston does not dispute that this meeting took place in Texas or that he attended. CR 320. Neither Appellees nor Vannaman initiated the meeting. CR 427, 1108, 1124, 2086-87.

4

Johnston and Shanbrom worked together equally to market the Investment Strategies to Appellees.  *Id.*  Shanbrom advised Appellees and Vannaman that BDO and Gramercy's tax and investment professionals had designed proprietary, tax-reducing investment plans that would provide Appellees with the potential of high returns and at the same time would, regardless of the investment outcome, legally minimize Appellees' capital gains and ordinary income obligations.  *Id.*  Johnston "was the consummate sales guy."  CR 1109.  Johnston said that Gramercy had other clients in Texas who had done distressed debt deals.  CR 428, 1109, 1124, 2087.

During the pitch, Shanbrom and Gramercy's Johnston discussed the steps of the distressed debt strategy in detail.  *Id.*  Shanbrom led the discussion about how the tax savings were derived from the strategy, with Johnston confirming the details of the distressed debt investments.  *Id.*  Johnston discussed how Gramercy designed and implemented the distressed debt investments and the types of distressed debt assets involved.  *Id.*  Shanbrom and Johnston told Appellees that BDO and Gramercy would work closely together in designing and implementing the distressed debt strategy.  CR 122, 429, 1110, 1125-26, 2088.  Shanbrom made specific recommendations about the amount of money Appellees should invest to maximize their legal tax savings.  CR 428, 1109, 1124, 2087.  During this discussion, Johnston was interested in the amount of tax saving involved because he needed to know whether Gramercy had sufficient distressed debt assets to meet BDO's

5

recommendation. *Id.* Shanbrom made it clear that Gramercy's distressed debt transactions were intended to take advantage of purportedly-legal tax loopholes to offset Appellees' anticipated tax liability. CR 428, 1109-10, 1125, 2087-88.

Both Johnston and Shanbrom stressed that if Appellees wanted to implement a distressed debt strategy for the 2000 tax year, Appellees needed to make an investment with Gramercy in November 2000. CR 121, 428, 1109-10, 1125, 2087-88. Shanbrom recommended that Appellees undertake a distressed debt strategy to be spread over a four-year period, beginning in the 2000 tax year. CR 122, 429, 1110, 1125-26, 2088.

In addition to discussing the nuts and bolts of the distressed debt transaction, Shanbrom repeatedly told Appellees that the distressed debt transactions were legal. CR 121, 428, 1109-10, 1125, 2088. Shanbrom said that if the IRS challenged the validity of the distressed debt strategy, Appellees would prevail. *Id.* Further, Shanbrom told Appellees that Sidley Austin, a reputable law firm, would issue "independent" opinion letters confirming that propriety of the distressed debt strategy. *Id.* Shanbrom touted R.J. Ruble, a partner at Sidley Austin, as the recognized expert on distressed debt strategies. *Id.* According to Shanbrom, Ruble would draft the legal opinion letters that would provide the required legal support to convince the IRS or a court that the transaction was legal in the event of an IRS challenge, provide the required legal support to prevail in any IRS challenge, and,

6

most importantly, provide absolute penalty protection from the IRS or a court assessing a penalty. *See id.* Johnston reiterated and confirmed what Shanbrom said about Sidley Austin and Ruble, including that Ruble was an expert in this area, Sidley Austin was a qualified and reputable law firm, and Gramercy had experienced good results from Sidley Austin on these types of transactions in the past. CR 428, 1109-10, 1125, 2088. Unbeknownst to Appellees, BDO and Gramercy had a preexisting arrangement with Sidley Austin to create "canned" legal opinion letters with significant input from BDO and Gramercy. CR 99-101, 121, 134-38. Sidley Austin, BDO, and Gramercy knew the legal opinion letters were dubious prior to and at the time they made these representations to Appellees. *Id.*

Johnston recommended that Appellees invest millions of dollars with Gramercy in addition to the investment made for the tax-reducing investment strategies. CR 120, 429, 1110, 1125-26, 2088. Doing so would, according to Shanbrom, provide Appellees with a diversified portfolio that allowed Appellees to achieve higher rates of return and, at the same time, strengthen Appellees' position in the event the IRS audited Appellees' tax returns with respect to the Investment Strategies. *Id.* Johnston reiterated and confirmed these points. CR 429, 1110, 1125-26, 2088.

Johnston and Shanbrom brought letter agreements for the Investment Strategies to the November meeting. CR 429-30, 1111, 1126, 2089, 2126-32.

7

Gramercy knew when it presented the letter agreements that (1) the Investment Strategies had a purely tax-related purpose, (2) it had already pitched the Investment Strategies as a legal way to reduce tax liability, and (3) it would continue to provide tax advice about the Investment Strategies prior to, during, and after the implementation of the transactions. CR 120-22. During the November meeting, Appellees discussed the substance of the letter agreements with Johnston and Shanbrom; however, both Johnston and Shanbrom assured Appellees that the Investment Strategies were legal and that the letters were simply part of documents needed for the transaction. CR 429-30, 1111, 1126, 2089. Based on these representations and assurances, Appellees later signed the letter agreements. CR 2126-32. Gramercy also presented draft investment management agreements at the November meeting. CR 430, 1111, 1126, 2089, 2136-2201.

## III. Gramercy entered into investment management agreements with Appellees to act as Appellees' attorney-in-fact

In reliance on BDO and Gramercy's advice at the November 7, 2000 meeting, Appellees entered into investment management agreements ("2000 IMAs") with Gramercy. CR 430, 1111, 1126, 2089, 2136-2201. On November 15, 2000, Gramercy sent the 2000 IMAs to Moorman in Texas and instructed him to "have the clients sign two copies of the IMA." CR 2089, 2133-35. Moorman then faxed the final agreements to Vannaman in Texas for Appellees' signatures. *Id.* Appellees signed the agreements, and Vannaman returned them to Gramercy. CR 2089.

8

Pursuant to the terms of the 2000 IMAs, Gramercy Advisors, LLC became Appellees' "attorney-in-fact" with regards to actions taken as their investment manager. CR 2137, 2148, 2159, 2170, 2181, 2192. Collectively, Appellees initially invested $4,000,000 under the 2000 IMAs. CR 2090. Gramercy accepted this payment drawn from various Texas bank accounts owned by Appellees. CR 2090, 2202-07. The 2000 IMAs called for a monthly management fee and an annual incentive fee. CR 2138, 2149, 2160, 2171, 2182, 2193. Under the 2000 IMAs, Gramercy was required to send any required notices to the applicable individual Plaintiff in Texas. CR 2143, 2154, 2165, 2176, 2187, 2198. Appellees and Vannaman received hundreds of mailings, faxes, and phone calls in Texas from Gramercy related to the Investment Strategies and other investments connected with the Investment Strategies. CR 2101. Gramercy admits that it mailed documents and sent emails and faxes in connection with the investments to Appellees in Texas. CR 279, 3641, 3642. Gramercy also invited Appellees to participate in periodic conference calls. *Id.*

## IV. Gramercy's contacts regarding the 2000 Digital Options Strategy

Based on the statements made during Gramercy and BDO's joint marketing pitch in Texas, Lowry, Chabaud, and Moffitt entered into tax-advantaged investments in 2000 involving the purchase and sale of digital options on foreign currency (the "Digital Options Strategy"). CR 122-23, 430, 1111, 1126, 2090.

9

Gramercy and BDO had marketed investments in foreign distressed debt transactions to Appellees at the November 2000 meeting. CR 120-22, 427-29, 1108-10, 1124-25, 2086-88. But, unbeknownst to Appellees, Gramercy and BDO did not have time to implement a distressed debt transaction for the 2000 tax year. CR 123, 2091-92. Gramercy, instead, engaged in the Digital Options Strategy on behalf of Appellees. CR 123, 430, 1111-12, 1127, 2091-92. BDO and Gramercy did not inform Appellees about the change in investment strategy until January 2001, after the Digital Options Strategy had been executed. *Id.*

BDO and Gramercy set up various LLCs through which Appellees participated in the Investment Strategies ("Investment LLCs").[1] CR 126-27, 2090-91. Each Investment LLC had its principal place of business in Texas and was a single-member, pass-through entity such that the entity was disregarded for tax purposes. CR 83-84, 430, 1111, 1126, 2090-91.

Gramercy acted as more than just an investment advisor to Appellees. *See* CR 122-23, 128-31. Gramercy's involvement in the design and implementation of the Digital Options Strategy was instrumental. *Id.* For instance, in April 2001, Johnston sent an email to Defendant Larry Cohen of BDO in which Johnston

---

[1] Each individual Appellee owned one or more of the Investment LLCs. Lowry's LLC was called L-Falling Creek (CR 1111); Chabaud had multiple LLCs (R-Ashley Wimbledon, R-Audrey Wimbledon, R-Russell Wimbledon, and R-RAC Wimbledon) for himself and trusts established for the benefit of his children (CR 430); and Moffitt's LLC was called J-Jason (CR 1126).

described "how I see" the Digital Options Strategy working for L-Falling Creek, J-Jason, R-RAC, and the Chabaud children's trusts (R-Russell, R-Audrey, and R-Ashley). CR 1267-74.[2] Johnston specifically referenced the "good leg" and "bad leg" of the binary options and showed the expected "net loss." *Id.* Gramercy no doubt knew that the main purpose of the Digital Options Strategy was to generate a tax loss. *See id.*

Gramercy played a key role in implementing the Digital Options Strategy. CR 122-23, 128-31. Gramercy created and managed LMC Recovery Fund LLC, the entity used to generate the losses associated with the Digital Options Strategy, and later the Distressed Debt Strategies. CR 130, 2091, 2208-99. In December 2000, Gramercy sent various agreements to Appellees in Texas to facilitate the purchase and sale of digital options on foreign currency. CR 122-23, 130, 2208-2318. The options contracts expired according to their terms in late December 2000, which generated the purportedly-legal partnership losses. CR 131.

Gramercy's Johnston and BDO's Moorman and Shanbrom again met with Appellees in Houston on January 11, 2001 to discuss the Digital Options Strategy and other investments with Gramercy. CR 431, 1112, 1127, 2092. At that meeting,

---

[2] The Affidavit of Todd Simmens signed on May 22, 2014 attaches and proves up this exhibit. It appears, however, that the district court clerk inadvertently included a duplicate of another Affidavit of Todd Simmens instead of the May 22, 2014 Affidavit. *Compare* CR 1136-38, *with* CR 2074-76. Rather than seeking additional extension time to correct the record, Appellees have simply cited to the Affidavit exhibits. Appellees have alerted the district court to this error and will have the May 22, 2014 Affidavit filed as a supplemental record.

11

Johnston and Shanbrom discussed tax issues, including the timing of the tax returns and legal opinion letters, as well as LMC, the partnership vehicle for generating the purported tax losses. CR 431, 1112, 1127, 2092, 2319-22. In or around March 2001, Randy Moorman of BDO relayed Gramercy's schedule of actions leading up to the receipt of the tax returns and K-1s related to the Digital Options Strategy. CR 2092. According to Gramercy, Appellees would receive legal opinion letter drafts and invoices from Sidley Austin—the firm selected by Gramercy based on the preexisting scheme between Sidley Austin, Gramercy, and BDO. *Id.* Next, Appellees would pay Sidley Austin. *Id.* After payment, Appellees would receive the final legal opinion letters. Finally, BDO would issue the tax returns. *Id.*

As manager of LMC, Gramercy directed BDO to prepare the federal tax return for LMC. *See* CR 138, 2092-93. Gramercy provided significant guidance to BDO on how to prepare the return, going so far as to tell BDO what tax forms to fill out and what numbers to put on certain lines of the return. CR 1275-80. In April 2001, Robert Lanava of Gramercy sent a memo to Larry Cohen of BDO outlining exactly how the Digital Options Strategy had worked. *Id.* The memo described how the "losses" were to be allocated. *Id.* The memo also included detailed advice about how the losses were to be reported on tax returns. *Id.* Ultimately, when BDO prepared LMC's 2000 tax return, BDO followed Lanava's instructions regarding

12

Form 4797 and included the *exact* language and figures used in Lanava's memo. *Compare id.*, *with* CR 2330.

Johnston, Moorman, and Shanbrom again met with Appellees and Vannaman, in Houston on May 8, 2001.  CR 431, 1112, 1127, 2093.  The parties discussed the legal opinion letter drafted by Sidley Austin and Appellees' tax losses for 2001.  *Id.* The parties also discussed non-tax advantaged investments with Gramercy.  CR 2093.  Once again, Gramercy and BDO initiated the meeting, not Appellees.  CR 431, 1112, 1127, 2093, 2359-50.  Appellees filed their individual tax returns using the K-1s prepared by BDO at Gramercy's direction.  CR 138, 431, 1112, 1127-28, 2093.

In addition to the fees from the IMAs and unbeknownst to Appellees, Gramercy also received millions of dollars in kick-backs from BDO derived from the consulting fees Appellees paid to BDO.  CR 103-04, 2074-75, 2077-83.  Gramercy and BDO never told Appellees about these kick-backs.  *Id.*  In total, BDO paid Gramercy $2,985,400 related to Appellees' Investment Strategies, plus millions more from other Texas residents.  CR 2074-83.  Before receiving payments from BDO, Gramercy sent BDO invoices that conspicuously referenced Appellees.  *Id.* For instance, Gramercy invoiced BDO for a $680,000 kick-back related to the Digital Options Strategy on or about April 19, 2001.  CR 2078.  The invoice specifically referenced "Union Gas (Lowry, Moffit, Chabaud)."  *Id.*

13

**V.     Gramercy's contacts regarding the 2001-2003 Distressed Debt Strategies**

Based on Gramercy and BDO's recommendations, Appellees Lowry, Chabaud, and Moffitt entered into tax-reducing investments in 2001, 2002, and 2003 involving investments in Gramercy-managed distressed debt funds ("2001 Distressed Debt Strategy," "2002 Distressed Debt Strategy," "2003 Distressed Debt Strategy"). CR 141-67, 431, 1112, 1128, 2093.

**A.     The 2001 Distressed Debt Strategy**

Prior to engaging in the 2001 Distressed Debt Strategy, Johnston discussed the details of the Investment Strategies with Appellees and Vannaman on several occasions, including at the November 2000 meeting in Houston. CR 427-29, 1108-12, 1124-26, 2086-89. In order to determine the amount of tax losses needed in 2001, BDO and Gramercy requested Appellees' income projections in a number of communications directed to Vannaman in Texas and during at least one in-person meeting in Texas. CR 2094-95, 2367-69. On September 27, 2001, Johnston, Moorman, and Shanbrom met with Lowry, Chabaud, and Vannaman in Houston. CR 432, 1113, 2094-95. At that meeting, Shanbrom and Johnston discussed Appellees' income projections for 2001 as well as the three-year outlook (2000-2002) in order to determine the losses to be generated by the Investment Strategies. *Id.* Additionally, Gramercy highlighted the performance of its other non-tax advantaged investments. CR 432, 1113.

14

Gramercy then began coordinating and implementing the 2001 Distressed Debt Strategy. CR 144-49. Gramercy had already sought out and acquired distressed debt assets specifically "targeted" for Appellees. CR 1284-95. In a May 2001 email from Johnston to Michael Kerekes, Larry Cohen, and Paul Shanbrom of BDO, Johnston attached a model agreement drafted by Gramercy's lawyers for the acquisition of distressed debt assets from a bank in Bulgaria and said, "[t]he position is targeted for Paul's client Union Gas of Houston Texas." *Id.* Union Gas refers to the oil and gas company owned by Appellees. *See* CR 2094-95.

On August 2, 2001, Gramercy's Robert Lanava faxed to Vannaman in Texas interest purchase agreements ("2000 IPAs") and requested that Appellees sign and return them to Gramercy. CR 2095, 2370-71. The next day, Robert Lanava called Vannaman to discuss the 2001 Distressed Debt Strategy. CR 2095. Lanava referred Vannaman to Johnston to discuss the details of the 2000 IPAs. *Id.* Vannaman then called Johnston. *Id.* During that phone call, Johnston told Vannaman that "*the interest purchase agreement is how the loss gets generated . . . offshore members contribute assets with built in loss; LMC group buys interest at x cash value; gets the benefit of the loss.*" CR 2095, 2372-73 (emphasis added). In practice, the 2000 IPAs worked just as Johnston described—the Investment LLCs acquired interests in distressed debt assets when the original owners of the debt instruments contributed those assets to LMC for a small membership interest in LMC. CR 144-45.

15

On October 11, 2001, Defendant Marc Helie of Gramercy mailed another set of IPAs to Moorman in BDO's Houston office and instructed Moorman to "arrange for their execution and return to my attention." CR 2096, 2374-75. Vannaman received the Helie letter and IPAs from Moorman. *Id.* In total, Gramercy sent Appellees in Texas three sets of IPAs, each concerning a separate distressed debt-owning entity (Gramercy Local Markets Recovery Fund, LLC, Lojas Americanas S.A., BANK DSK, AD). CR 2096, 1300-1590. Appellees signed the 2000 IPAs and returned them to Gramercy. CR 2096. Under the terms of the 2000 IPAs, any time Gramercy was required to give notice of any kind to Appellees, it was required to send the notices to the applicable Investment LLC in Texas. *See, e.g.,* CR 1313.

Acting on Appellees' behalf, Gramercy caused LMC to sell a portion of LMC's distressed debt assets to Defendant Gramercy Financial Services for considerably less than the assets' alleged tax basis. CR 145, 1591-94. This sale created the losses that Appellees ultimately claimed on their 2001 tax returns. CR 145-48.

Based on their preplanned scheme with Gramercy and BDO, Sidley Austin drafted the legal opinion letters for the 2001 Distressed Debt Strategy. *Id.* Gramercy guided Sidley Austin in this endeavor. *Id.* For example, in September 2000, Sidley Austin sent a draft opinion letter to Johnston for Gramercy's "Distressed Debt Fund" seeking his input in the substance of the opinion and copying Gramercy's lawyers—

16

McDermott Will & Emery—to ensure that they were comfortable with the description of Gramercy's role. CR 1139-1225.

As manager of LMC, Gramercy directed BDO to prepare the federal tax return for LMC for the tax year 2001. CR 149. Prior to receiving the tax returns and K-1s, Johnston, possibly Scott Seaman, and at least one representative of BDO met with Appellees in Houston on June 20, 2002 to discuss, among other things, the timing of the returns. CR 432, 1113, 2096-97, 2683-87. Appellees filed their individual tax returns in or about October 2002 using the K-1s prepared by BDO at Gramercy's direction. CR 149, 433, 1113, 1128, 2096-97.

## B. The 2002 Distressed Debt Strategy

Gramercy developed, marketed, sold, coordinated, and implemented the 2002 Distressed Debt Strategy. CR 150-51. The 2002 Distressed Debt Strategy was a continuation of the 2001 Strategy. CR 150.

In mid-2001, BDO requested income projections for Appellees to help determine the amount of tax loss that needed to be generated by the 2002 Distressed Debt Strategy. CR 2097. On June 20, 2002, Johnston, possibly Scott Seaman, and at least one representative of BDO met with Appellees in Houston to discuss 2002 income expectations for Appellees. CR 432, 1113, 1128-29, 2097. During that meeting, Johnston also highlighted the performance of its other non-tax advantaged investments. CR 2097. Gramercy used the information gathered during this meeting

17

and the September 2001 meeting in Houston to determine the amount of losses that it needed to generate for Appellees. CR 432, 1113, 1128-29, 2097. Acting on Appellees' behalf, Gramercy caused LMC to sell a portion of the distressed debt assets to Gramercy Financial Services for considerably less than the assets' basis. CR 1595-96. This created the losses that Appellees claimed on their 2002 tax returns. CR 152-56.

BDO recommended that Appellees engage De Castro West, a different law firm from the one previously used, to issue a legal opinion letter about the 2002 Distressed Debt Strategy. CR 152-56, 432-33, 1114, 1128-29, 2097. Appellees and Vannaman asked Johnston his opinion of De Castro West. CR 432-33, 1114, 1128-29, 2097. Johnston confirmed that De Castro West was a good law firm and said that other Gramercy clients had been pleased with De Castro West. *Id.* Gramercy had previously helped craft the language contained in the Sidley Austin legal opinion letters. CR 1139-1225. From the beginning, Gramercy and BDO had intended to use the same Sidley Austin legal opinion letter as a "building block" for De Castro West to use. *See* CR 1139-1125, 1903-92, 2097.

Gramercy hired Financial Strategy Group ("FSG") to prepare the LMC tax return and K-1s. CR 138, 861-71. Gramercy played a key role in directing and overseeing FSG's preparation of the tax documents. CR 856-60, 872-73, 842-43, 846-47, 851-52. Emails between Gramercy's employee, John DelVirginia, and FSG

18

show that DelVirginia guided FSG in preparing the returns, even to the point of telling FSG specific information to include on the returns. CR 856-60, 872-73. FSG's corporate representative, Andy Shaul, admitted in his deposition that FSG "did whatever John DelVirginia wanted us to do." CR 851-52. FSG completed the LMC tax returns and delivered them to Gramercy. CR 853, 2786-2837. Gramercy then delivered the returns and K-1s to Vannaman in Texas. CR 2098, 2786-2837. Appellees filed their individual tax returns using the K-1s that Gramercy delivered. CR 156, 433, 1114, 1129, 2098.

### C. The 2003 Distressed Debt Strategy

Gramercy developed, marketed, sold, coordinated, and implemented the 2003 Distressed Debt Strategy. CR 158-59. The 2003 Distressed Debt Strategy was a continuation of the 2001 and 2002 Strategies. CR 160. In addition to the distressed debt assets acquired on Appellees' behalf by Gramercy in 2001, LMC acquired additional distressed debt assets. CR 160, 1601-1718.

Gramercy drafted interest transfer agreements ("ITAs") for the new distressed debt assets and brought the agreements to a meeting with Appellees and Vannaman in Houston on April 9, 2003. CR 433, 1114, 1129, 2098-99. Robert Koenigsberger and Scott Seaman attended the meeting for Gramercy. *Id.* The ITAs contained notice sections requiring Gramercy to send all notices to Texas. *See, e.g.,* CR 1611.

19

Acting on Appellees' behalf, Gramercy caused LMC to sell a portion of LMC's distressed debt assets to Gramercy Financial Services for considerably less than the assets' basis. CR 1597-1600. This sale created the losses that Appellees claimed on their 2003 tax returns. CR 165.

Appellees engaged De Castro West to issue an opinion letter attesting to the legality of the transaction. CR 161-65, 433, 1114, 1129, 2098-99. Gramercy again confirmed its positive impression of and experience with De Castro West. CR 433, 1114, 1129, 2098-99. Gramercy also utilized FSG to prepare the 2003 federal tax return for LMC and K-1s for the Investment LLCs. CR 165, 864-65. Once again, Gramercy communicated with FSG regularly and had extensive input into how the tax return was prepared. CR 846-47, 851-52, 856-60, 872-73. LMC had to file for an extension on its 2003 tax return. CR 2098-99, 2924-26. To do so, Gramercy emailed Vannaman about the extension and then faxed a copy of the tax form to Vannaman in Texas. *Id.*

LMC's principal place of business changed in 2003 from an address in Connecticut (connected to Gramercy) to an address in Spring, Texas (connected to Lowry). CR 2099. In an email from John DelVirginia of Gramercy to Andy Shaul and Steve Burford of FSG, DelVirginia instructed FSG to make the address change. CR 872-73. Thus, Gramercy knew it was having a tax return prepared for the benefit of a Texas partnership. *See id.* Moreover, Gramercy instructed FSG to change the

20

tax matters partner[3] on the 2003 tax return from a Gramercy-controlled entity, as it had been in the 2002 returns, to "Randall K. Lowry, Jr." at an address in Spring, Texas. CR 872-73.

On February 3, 2004, Gramercy's Johnston and Seaman came to Houston to personally deliver a preliminary version of the tax return and K-1s to Vannaman and Lowry. CR 856-60, 2099-2100, 2927-3000. Those tax documents were not filed by Appellees or LMC; instead, Gramercy recommended that LMC request an extension. CR 2098-2100. Once the return was completed in October 2004, Seaman mailed to Vannaman in Texas (1) a filing copy of the tax return, (2) a copy of the return for Vannaman's records, and (3) K-1s for distribution to the Investment LLCs. 2099-2100, 3001-03. Appellees filed their individual tax returns using the K-1s delivered by Gramercy. CR 165, 433, 1114, 1129.

## VI. At a meeting in Texas, Gramercy marketed a new distressed debt strategy to Appellees in 2003

Appellees expected to receive significant proceeds from the sale of oil and gas properties in tax year 2004. CR 168, 433, 1115, 2100. Appellees anticipated that all of the tax savings generated by the first phase of the Investment Strategies would

---

[3] The tax matters partner plays a significant role for the partnership. *In re Martinez*, 564 F.3d 719, 729 (5th Cir. 2009). The tax matters partner is "the central figure of partnership proceedings" and "serves as the focal point for service of all notices, documents and orders of the partnership." *Id.* at 729. A tax matters partner owes a fiduciary duty to the partnership and partners. *Id.* at 728-29.

be used by the end of 2003.  CR 2100.   BDO and Gramercy instructed and advised Appellees to enter into a second phase of distressed debt strategies.  CR 168.

Gramercy's Johnston and representatives from BDO met with Lowry and Vannaman in Houston on May 26, 2003 to market the second phase, which would begin starting with the 2004 tax year.  CR 1115, 2100.  During the meeting, Shanbrom and Johnston discussed the structure of the transactions, the nature of the distressed debt, the agreements that would be required, the funding requirements necessary to generate the losses, and the continuing necessity of the legal opinion letters associated with the strategies.  *Id.*

Lowry asked Johnston specific questions during this meeting about the distressed debt assets associated with this second phase of the Investment Strategy. *Id.*  Johnston said that the assets were Russian utility receivables and that he had personally been to Russia to investigate the investment and had the collection program under control.  *Id.*  Johnston repeatedly assured Lowry and Vannaman that Gramercy's debt collection efforts were genuine and that the assets could produce a positive return beyond the tax savings.  *Id.*  Following the May meeting, Gramercy's in-house attorney, David Metzman, began emailing preliminary investment management agreements and draft transaction documents to Vannaman in Houston for Appellees to review.  CR 2100, 3077-82.

Based on Gramercy and BDO's recommendations, Appellees undertook the second phase of the Investment Strategy in which they expected $40 million in tax losses to be spread over the tax years 2004 and 2005. CR 433-34, 1115, 1130, 2101. Gramercy employees and Vannaman communicated regularly during this time period to finalize the investment management agreements ("2003 IMAs"), which were signed by Defendant Gramercy Asset Management LLC. CR 2101, 3085-3204.

Pursuant to the terms of the 2003 IMAs, Gramercy Asset Management became Appellees' "attorney-in-fact" with regards their investments. CR 3085-3204. Collectively, Appellees initially invested nearly $750,000 with Gramercy Asset Management under the 2003 IMAs. CR 3085-3204. Robert Lanava requested this money in an email with Vannaman in May 2003, which Appellees paid using Texas bank accounts. CR 2101, 3205-06. The 2003 IMAs allowed Gramercy Asset Management to collect "a management fee and incentive allocations . . ." CR 3085-3204. Under the 2003 IMAs, Gramercy Asset Management was required send any notices to the applicable individual Plaintiff in Texas. CR 3085-3204.

Gramercy Asset Management also sent a letter agreement to Appellees in Texas regarding the tax-reducing investments. CR 2102, 3209-20. This letter agreement was similar to the one drafted by Gramercy Advisors. CR 3209-20.

## VII. Gramercy's contacts regarding the 2004-2005 Distressed Debt Strategy

Based on Gramercy and BDO's joint marketing efforts, Lowry, Chabaud, and Moffitt entered into Investment Strategies in 2004 and 2005 ("2004 Distressed Debt Strategy" and "2005 Distressed Debt Strategy"). CR 167-237, 434, 1115-16, 1130, 2102.

### A. The 2004 Distressed Debt Strategy

Appellees received the distressed debt assets related to the 2004 Distressed Debt Strategy through EROSE LLC, a company owned in part by Gramercy Advisors. CR 170. On Appellee's behalf, Gramercy organized and used various LLCs to accomplish the 2004 Distressed Debt Strategy. CR 170, 1719-28, 1771-80, 1823-32, 2102-03. Gramercy drafted interest transfer agreements ("2003 ITAs") to effectuate the Strategy and sent them to Appellees in Texas. CR 2102-03, 3347-3436. The 2003 ITAs required Gramercy Asset Management to send all notices to the applicable individual Plaintiff in Texas. *See, e.g.,* CR 3357. Gramercy sent other agreements to Appellees in Texas as part of the 2004 Distressed Debt Strategy. CR 1729-70, 1781-1822, 1833-74, 2102-03, 3221-3346, 3437-3464. Acting on Appellees' behalf, Gramercy caused entities owned by Appellees to transfer their distressed debt assets to Defendant Gramercy Financial Services for considerably less than the assets' basis. CR 1875-89. This sale created the losses that Appellees claimed on their 2004 tax returns. CR 174.

24

In December 2004, Appellees and Gramercy converted some of the entities involved in the 2004 Distressed Debt Strategy to Texas LLCs. CR 2103. Gramercy, BDO, and Appellees discussed the decision to change domicile and entity names on a number of occasions via telephone and email. *Id.* Gramercy's in-house counsel, David Metzman, and Appellees' outside counsel in Texas, Gary Alletag, worked together to develop the documents necessary to effectuate those changes. *Id.*

Gramercy again recommended that Appellees engage De Castro West to issue a legal opinion letter concerning the transactions. *See* CR 171-74. Gramercy Advisors hired FSG to prepare the 2004 federal tax returns and K-1s for the entities involved in the 2004 Distressed Debt Strategy. CR 866-67, 2103-04, 3465-3530. Gramercy Asset Management mailed the completed K-1s to the Appellees in Texas. CR 434, 1116, 1130, 2103-04, 3531-36. Importantly, the cover letter from Gramercy attaching the K-1s contained multiple paragraphs advising Appellees about federal tax shelter laws, including the new tax form regarding "Reportable Transaction Disclosures." CR 3531-36. The tax returns and K-1s contained Form 8886s disclosing that entities owned by Appellees had participated in reportable transactions. *See, e.g.,* CR 3474-75. The Form 8886s also disclosed that Gramercy Advisors had "promoted, solicited, or recommended [Appellees' participation] in the transaction, or provided tax advice related to the transaction." *Id.* Appellees

25

filed their individual tax returns using the K-1s sent to Appellees by Gramercy Advisors. CR 175, 434, 1116, 1130.

## B. The 2005 Distressed Debt Strategy

Gramercy developed, marketed, sold, coordinated, and implemented the 2005 Distressed Debt Strategy. CR 167-75. The 2005 Distressed Debt Strategy worked as a continuation of the 2004 Distressed Debt Strategy. CR 175. In reliance of Gramercy's advice, Appellees carried over losses purportedly created by the 2004 Distressed Debt Strategy to their federal tax returns for 2005. CR 175, 2102. Appellees filed their individual tax returns using the K-1s mailed to Appellees by Gramercy. CR 175, 434, 1116, 1130.

## VIII. Gramercy marketed related investments to Appellees in Texas, sent monthly account statements and emails to Appellees in Texas, and invited Appellees to participate in regular conference calls

During the November 2000 meeting in Texas, Gramercy's Jay Johnston recommended that Appellees invest significant sums of money with Gramercy in funds not directly involved in the tax losses generated by the Investment Strategies. CR 120, 429, 1110, 1125-26, 2088. According to Shanbrom and as confirmed by Johnston, doing so would allegedly strengthen Appellees' position with respect to the tax-advantaged transactions. CR 120, 429, 1110, 1125-26, 2088. Based on this advice, Appellees invested around $15 million with Gramercy in addition to the money for the Investment Strategies. *Id.*

26

Shortly after the November 2000 meeting, Gramercy requested wire transfers from Appellees in Texas related to the non-tax advantaged investments. CR 2094, 2353-54. In March 2001, Gramercy's Young sent wiring instructions to Texas for a $1 million contribution. CR 2094. Young sent wiring instructions to Vannaman for an additional $5.4 million over the next several months. *Id.* By the end of 2001, Gramercy had requested and Appellees had contributed a total of $10.4 million to Gramercy for non-tax advantaged investments. *Id.*

Utilizing the same Plaintiff-owned entities used in the Investment Strategies, Gramercy made investments in emerging markets on Appellees' behalf as their investment advisor and attorney-in-fact. CR 2104. Gramercy employees and representatives discussed these investments with Lowry and Vannaman at meetings in Texas, including at some of the meetings mentioned previously in this brief. CR 1116, 2104-05. In addition to the previously-mentioned meetings in Texas, Gramercy also came to Texas to discuss non-tax advantaged investments on February 3, 2004 and July 12, 2004. *Id.* Scott Seaman, Jay Johnston, and Robert Koenigsberger of Gramercy attended the February meeting. *Id.* Scott Seaman, Jay Johnston, and Robert Rauch of Gramercy attended the July meeting. *Id.*

As the record reflects and as Gramercy admits in its Brief, Gramercy regularly sent written communications to Appellees in Texas related to these non-tax advantaged investments, including monthly account statements and email "flash"

previews of those statements.  Appellant Br. at 30; CR 279, 434-45, 1116, 1118-21, 1130-35, 2105, 3542-55, 3641, 3642.  Appellees' representative received dozens if not hundreds of email "flash" previews.[4]  CR 2105.  Later, Gramercy set up a secure website and provided Vannaman with a user name and password to access account statements and other information related to the investments.  *Id.*  Gramercy also invited Appellees to participate in quarterly conference calls related to the non-tax advantaged investments.  *Id.*  Seaman sent Vannaman the conference call number via email for each quarterly call.  *Id.*  From Texas, Vannaman participated in many of these conference calls.  *Id.*

## IX.  Gramercy aided Appellees in responding to the IRS audit by forwarding IRS audit notices to Texas and wiring payments to Texas law firms from Gramercy-managed bank accounts

In February 2004, Gramercy received an audit notice from the IRS related to LMC's 2000 tax return.  *See* CR 2105, 3556-60.  Gramercy faxed this notice and, later, a copy of LMC's 2000 tax return to Vannaman in Texas.  CR 2105, 3556-82.

Appellees hired a Texas-based law firm, Chamberlain Hrdlicka, to handle the audit.  CR 2106.  Gramercy wired payments from LMC's Gramercy-managed bank account to Chamberlain to pay the audit-related legal bills.  *See* CR 929-31.  As

---

[4] Gramercy takes issue with Vannaman's testimony that he received "hundreds of mailings from Gramercy" because he did not attach *all* of these communications to his affidavit.  *See* Appellant Br. at 33 n. 18.  Simply because Vannaman chose to provide examples rather than every written communication he received from Gramercy does not make his testimony any less credible. Gramercy has also not pointed to any evidence in the record to rebut Vannaman's testimony on this issue.

manager of LMC Gramercy also paid thousands of dollars to the Texas law firm, Baker Hostetler, for work related to the Investment Strategies. CR 2106, 3583-84.

## X. The trial court denied Gramercy's special appearance

The trial court denied Gramercy's Special Appearance on October 17, 2014. CR 3762. The trial court did not issue findings of fact and conclusions of law.

## SUMMARY OF THE ARGUMENT

Because the trial court did not err in denying Gramercy's Special Appearance, this Court should affirm. There is no dispute that Gramercy made jurisdictional contacts with Texas—including attending numerous meetings in Texas with Appellees. The narrow issue on appeal focuses on the substantial connection between those contacts and the operative facts of the litigation.

There is legally and factually sufficient evidence to support a substantial connection. Gramercy met face-to-face with Appellees *in Texas* on numerous occasions to market, sell, and implement the Investment Strategies at issue in this case. The record shows that Gramercy made misrepresentations concerning the Investment Strategies at those meetings. Gramercy's role was much broader than merely executing BDO's play calls. Instead, Gramercy was involved from the beginning in every aspect of the Investment Strategies, including discussing the allege tax benefits with Appellees as part of the sales pitches in 2000 and 2003. Those meetings alone should subject Gramercy to jurisdiction in Texas. Gramercy's

29

other Texas contacts are also substantially connected to the Investment Strategies and further support affirming the trial court's order.

## STANDARD OF REVIEW

The existence of personal jurisdiction is a question of law necessitating a *de novo* review. *Moncrief Oil Int'l v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). Trial courts, however, must frequently resolve factual disputes before deciding jurisdictional questions. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). When the trial court does not issue findings of fact and conclusions of law (which is the case here), "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software*, 83 S.W.3d at 795. If the appellate record includes the reporter's and clerks records, this Court must accept the trial court's implied resolution of any factual issues so long as the trial court's decision is supported by legally and factually sufficient evidence. *See id.* Sufficiency review is highly deferential. *Id.* "The amount of evidence necessary to affirm a [special appearance] judgment is far less than that necessary to reverse a judgment." *Johns Hopkins Univ. v. Nath*, 238 S.W.3d 492, 497 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). For both legal and factual sufficiency purposes, "[t]he factfinder is the sole judge of the credibility of the witnesses and the weight of their testimony." *Id.* A court of appeals may not substitute its own judgment for that of the fact finder, even if it would reach a different answer on the

30

evidence. *Xenos Yuen v. Fisher*, 227 S.W.3d 193, 204 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

## ARGUMENT

### I.    Law governing Gramercy's Special Appearance

The Texas long-arm statute permits Texas courts to exercise jurisdiction over nonresident defendants. TEX. CIV. PRAC. & REM. CODE § 17.041-.042; *GE v. Brown & Ross Int'l Distribs., Inc.*, 804 S.W.2d 527, 530 (Tex. App—Houston [1st Dist.] 1990, writ denied). The Texas long-arm statute extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit. *BMC Software*, 83 S.W.3d at 795. Personal jurisdiction over nonresident defendants is constitutional whenever: (1) the defendants have established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.*

The minimum contacts of a nonresident can give rise to either general or specific jurisdiction (Appellees do not argue that Gramercy is subject to general jurisdiction.) *Id.* at 795-96. Specific jurisdiction requires: (1) purposeful contact by the defendants with Texas, and (2) a relationship between those purposeful contacts and the plaintiff's causes of action. *See Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576 (Tex. 2007). If a nonresident defendant purposefully avails itself of the privileges and benefits of conducting business in Texas, then it

31

has sufficient minimum contacts with the state to be subject to personal jurisdiction.

*See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005).

The following three factors are relevant to purposeful contact analysis:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person.  Second, the contacts must be purposeful, not just random, fortuitous, or attenuated.  *Thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities.*  Finally, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction.

*Moncrief*, 414 S.W.3d at 151 (emphasis added).

The Texas Supreme Court recently reiterated that it is not the number but rather the quality and nature of the contacts with the forum state that are important. *Id*.  Even a single act can be sufficient as long as it creates a substantial connection to the forum.  *Id.*  Although the extent of a defendant's contacts with the forum state may be minimal, the quality and nature of those contacts may be substantial.  *Id.*  It is also not necessary that the nonresident defendant's conduct actually occur in Texas or that the defendant even enter Texas.  *Id.* At 152.  "At its core, the purposeful availment analysis seeks to determine whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there."  *Id.* at 152.

The parties to a special appearance bear shifting burdens of proof.  *Kelly v. Gen. Interior Const., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010).  The plaintiff bears the

initial burden of pleading facts sufficient to confer jurisdiction. *Id.* Both the petition and plaintiff's response to the special appearance can be considered in determining whether plaintiff met this burden. *Crithfield v. Boothe*, 343 S.W.3d 274, 282 (Tex. App.—Dallas 2011, no pet.). The defendant then shoulders the burden of negating all the bases of jurisdiction. *Moncrief*, 414 S.W.3d at 150.

If minimum contacts with Texas exist, the court must then consider whether the exercise of personal jurisdiction would nevertheless offend traditional notions of fair play and substantial justice. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 341-42 (Tex. 2009). Defendants must present a "compelling case that the presence of some other considerations renders the exercise of jurisdiction unreasonable." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991). "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Id.*

## II. Gramercy purposefully directed actions at Texas that are substantially connected to the allegations in this case

### A. Gramercy crossed a "bright line" by marketing the Investment Strategies and making misrepresentations to Appellees at meetings in Texas

This is not a case involving unilateral actions by Appellees or third parties; rather, Gramercy marketed and made misrepresentations about the Investment

33

Strategies to Appellees at numerous meetings in Texas. Courts uniformly exercise specific jurisdiction where a nonresident defendant attended meetings in Texas concerning the facts of the lawsuit. *See, e.g.*, *Moncrief*, 414 S.W.3d at 153; *Max Protetch v. Herrin*, 340 S.W.3d 878, 887-88 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Horizon Shipbuilding, Inc. v. Blyn II Holding, LLC*, 324 S.W.3d 840, 849 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Citrin Holdings v. Minnis*, 305 S.W.3d 269, 284 (Tex. App.—Houston [14th Dist.] 2009, no pet.). For example, in *Moncrief*, the Supreme Court of Texas held that a Russian oil and gas company's contacts with Texas supported the exercise of personal jurisdiction with regard to a misappropriation of trade secret claim where the Russian company accepted the trade secrets at a meeting in Texas. 414 S.W.3d at 153, 156-58. The court rejected Gazprom's argument that its "intent in attending the [Texas] meetings was to discuss an unrelated matter and that they informed the plaintiff of that intent at the meetings." *Id.* at 147. The court reasoned that "courts at the jurisdictional phase examine business contacts, not what the parties thought or intended." *Id.* at 154.

The *Moncrief* holding is important for several reasons. First, the Supreme Court of Texas reinforced the legal principle that "physical presence in the state is not required but frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there." *Id.* at 152 (internal quotations omitted). Thus, nonresident defendants are more likely to be subject to

personal jurisdiction in cases where they have attended meetings in Texas regarding the subject-matter of the lawsuit. *Id.* at 152-54. Second, the court distinguished *Michiana* and called into question *Michiana's* applicability to cases where jurisdiction is predicated on more than just "an out-of state phone call" initiated by the plaintiff and shipment of a single product to Texas. *See id.* at 152-53. Third, the court held that a nonresident's contacts with Texas are not unilateral nor random and fortuitous when the nonresident "had a say in the matter." *Id.* at 153 (internal quotations omitted).

Likewise in *Max Protetch*, the court held that voluntarily traveling to Texas to conduct business with a Texas resident and allegedly making misrepresentations at that meeting crosses a "*bright line*" sufficient to establish jurisdiction. 340 S.W.3d at 887 (emphasis added). Other cases in this appellate district have held similarly. *See Citrin*, 305 S.W.3d at 280-89; *Horizon*, 324 S.W.3d at 850. For instance, in *Citrin* several face-to-face meetings in Texas as well as numerous phone calls, faxes, and emails with Texas residents concerning the real estate partnership at issue met the minimum contacts standard. *Id.* at 280-89. The misrepresentations at issue in the lawsuit allegedly were made during those meetings and in the phone calls, faxes, and email directed at Texas. *Id.* at 284. Likewise, in *Horizon* the court exercised specific jurisdiction over an out-of-state defendant where the defendant had made

35

alleged misrepresentations to the plaintiff at two face-to-face meetings in Houston. *Horizon*, 324 S.W.3d at 850.

Similarly, in this case, Gramercy crossed this "bright line" by repeatedly meeting with Appellees in Texas to discuss the Investment Strategies. CR 120-22, 320-21, 427-29, 431-33, 1108-10, 1112-16, 1124-25, 1127-29, 2086-88, 2092-2100, 2104-05, 3701-02. As in *Citrin* and *Horizon*, Gramercy directly marketed the Investment Strategies to Appellees at meetings in Texas on at least two occasions. CR 427-29, 1108-10, 1115, 1124-25, 2086-88, 2100. Similar to *Moncrief*, Gramercy admits that at least the first meeting occurred in Texas. *See* Appellant Br. at 15; CR 320-21, 3701-02. Gramercy and BDO initiated the meeting.[5] CR 427, 1108, 1124, 2086-87. Thus, Gramercy "had a say" in when and where the meeting would take place. *See Moncrief*, 414 S.W.3d at 153.

As in *Moncrief*, Appellees claim and the record reflects that Gramercy, through its employee Jay Johnston, made material misrepresentations at the November 2000 meeting in Texas. CR 427-30, 1108-11, 1124-26, 2086-90. Johnston confirmed many details about the tax-reducing nature of the Investment Strategies. *Id.* Johnston touted Sidley Austin and R.J. Ruble's positive reputations immediately after BDO's Shanbrom told Appellees that:

- the Investment Strategies were a legal way to reduce tax liability;

---

[5] Gramercy disputes this fact but all fact issues must be resolved in Appellees' favor at this point. *BMC Software*, 83 S.W.3d at 795.

36

- if the IRS challenged the validity of the Investment Strategies, Appellees would prevail;

- Sidley Austin would issue an "independent" opinion letter concerning confirming the propriety of the Strategies; and

- Sidley Austin's opinion letter would overcome any IRS challenge and would provide absolute penalty protection.

CR 121, 428-29, 1110, 1125, 2088. Johnston misrepresented the type of Investment Strategy that Gramercy would pursue for Appellees in 2000—Gramercy undertook a digital options strategy, instead of the distressed debt strategy it sold to Appellees, without informing Appellees of the change until after the transactions were completed. CR 123, 430, 1111-12, 1127, 2091-92. Johnston also materially misrepresented the effect and purpose of the letter agreements that it brought to the meeting. CR 429-30, 1111, 1126, 2090. Gramercy knew that these statements were false when made during the Texas meeting with Appellees. CR 120-22.

Gramercy pitched a second round of Investment Strategies to Appellees at a meeting in Texas in 2003. CR 168, 1115, 2100. Johnston's pitch was similar to his pitch in 2000. CR 1115, 2100. Similar to *Moncrief*, Johnston once again made misrepresentations about the legality of the Investment Strategies at this meeting. *Id.* When pressed by Lowry, Johnston said that Gramercy had a genuine system set up to collect on the Russian utility receivables to be used in the Investment Strategy. *Id.* Johnston also assured Lowry that the assets could produce a positive return on

37

investment above and beyond the tax savings—*a fact Gramercy does not rebut*. *Id.* In reality, these investments had no economic substance and were merely a sham. *See* CR 175-76. Appellees do not argue that BDO's statements at these marketing meetings are attributable to Gramercy through the "conspiracy theory of jurisdiction," as Gramercy claims. Appellant Br. at 20. Rather, the record shows that Johnston himself made affirmative misrepresentations and verbally confirmed statements made by BDO. CR 427-30, 1108-11, 1115, 1124-26, 2086-90, 2100.

Johnston pitched other investments to Appellees and confirmed that these investments would allegedly strengthen Appellees' position in the event of an IRS audit. CR 120, 429, 1110-11, 1126, 2088-89. Johnston and Shanbrom's pitch regarding other investments was centered on linking these other investments to the tax-advantaged investments. *Id.* Appellees aver that Gramercy used these other investments to induce Appellees to participate in the tax-advantaged investments. *Id.* Thus, to the extent Gramercy discussed those non-tax advantaged investments in connection with the tax-advantaged ones, those Texas contacts are relevant for jurisdictional purposes. *See id.*

Gramercy attended more meetings in Texas related to the Investment Strategies than in *Moncrief* (2 meetings), *Horizon* (2 meetings), *Citrin* (2 meetings), and *Max Protetch* (1 meeting). CR 120-22, 320-21, 427-29, 431-33, 1108-10, 1112-16, 1124-25, 1127-29, 2086-88, 2092-2100, 2104-05, 3701-02. In addition to

marketing meetings in 2000 and 2003, Gramercy met with Appellees in Texas on

seven other occasions to discuss the Investment Strategies. *Id.* The following chart

shows the date, location, and attendees of each of the *nine meetings*:

| Date | Location | Attendees |
|---|---|---|
| November 7, 2000 | Houston | Lowry, Moffitt, Chabaud, Vannaman, Appellees' oil and gas transactional attorney, Moorman (BDO), Shanbrom (BDO), and Johnston (Gramercy). CR 120-22, 320-21, 427-29, 1108-10, 1124-25, 2086-88, 3701-02. |
| January 11, 2001 | Houston | Lowry, Moffitt, Chabaud, Vannaman, Moorman (BDO), Shanbrom (BDO), and Johnston (Gramercy). CR 431, 1112, 1127, 2092. |
| May 8, 2001 | Houston | Vannaman, Lowry, Chabaud, Moffitt, Shanbrom (BDO), Moorman (BDO), and Johnston (Gramercy). CR 431, 1112, 1127, 2093. |
| September 27, 2001 | Houston | Lowry, Chabaud, Vannaman, Moorman (BDO), Shanbrom (BDO), and Johnston (Gramercy). CR 432, 1113, 2094-95. |
| June 20, 2002 | Houston | Lowry, Chabaud, Moffitt, Vannaman, at least one representative from BDO, Johnston (Gramercy), and possibly Scott Seaman (Gramercy). CR 432, 1113-14, 1128-29, 2096-97. |
| April 9, 2003 | Houston | Lowry, Moffitt, Chabaud, Vannaman, at least one representative from BDO, and Robert Koenigsberger (Gramercy), Scott Seaman (Gramercy). CR 433, 1114, 1129, 2098. |
| May 26, 2003 | Houston | Lowry, Vannaman, Shanbrom (BDO), Moorman (BDO), and Johnston (Gramercy). CR 168, 1115, 2100. |

| Date | Location | Attendees |
|------|----------|-----------|
| February 3, 2004 | Houston | Lowry, Vannaman, Johnston (Gramercy), Seaman (Gramercy), and Koenigsberger (Gramercy). CR 857, 1116, 2099-2100, 2104-05. |
| July 12, 2004 | Houston | Lowry, Vannaman, Johnston (Gramercy), Seaman (Gramercy), and Robert Rauch (Gramercy). CR 1116, 2104-05. |

During all except for the July 12, 2004 meeting, Gramercy discussed the tax-advantaged nature of the Investment Strategies. *See* Chart above. At many of the meetings, Gramercy also discussed the legal opinion letters and tax return documents needed for the Strategies. *See* Chart above. At the July 12, 2004 meeting, Gramercy discussed non-tax-reducing investments that Gramercy had previously pitched as beneficial to the tax-reducing investments. CR 1116, 2104-05. These numerous meetings in Texas between Gramercy and Appellees are more than sufficient to establish jurisdiction.

## B. Gramercy's meeting in Texas are substantially connected to the Investment Strategies

For specific jurisdiction to arise, "there must be a substantial connection between [the nonresident's forum contacts] and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585. A connection between the forum contacts and the facts of the litigation is substantial where the forum contacts "will be the focus of the trial." *Id.* Courts, including the Supreme Court of Texas, have found a

40

substantial connection where the plaintiff's claims related to misrepresentations made at meetings in Texas. *Moncrief*, 414 S.W.3d at 153; *Max Protetch*, 340 S.W.3d at 888; *Horizon*, 324 S.W.3d at 849-50.

Here, Gramercy's numerous, purposeful contacts are substantially connected to the Investment Strategies at the center of this case. The trial against Gramercy will focus largely on Gramercy's development, marketing, sale, and implementation of the Investment Strategies. Appellees allege, among other things, fraud, negligent misrepresentation, and breach of fiduciary duty against Gramercy. CR 189-95, 201-208. Statements made by Gramercy about the Investment Strategies will be critically important at trial. As in *Max Protetch*, Gramercy employees and representatives made many of the misrepresentations to Appellees at face-to-face meetings in Texas and in phone calls, mailings, faxes, and emails directed to Appellees and Appellees' representative in Texas. *See, e.g.,* CR 120-22, 320-21, 427-29, 431-33, 1108-10, 1112-16, 1124-25, 1127-29, 2086-88, 2092-2100, 2104-05, 3701-02. Gramercy states that Appellees "do not claim Mr. Johnston made *any* of the tax-related statements that form the basis for their claims at the November 2000 Texas meeting." Appellant Br. at 17. But the record is teeming with allegations, testimony, and documentary evidence concerning Johnston's statements at the November 2000 meeting about the tax advantages and legality of the Investment Strategies. *See, e.g.,* CR 120-22, 2086-89, 2100.

41

Gramercy seeks to sever the connection between its numerous contacts with Texas and the underlying facts of Appellees' lawsuit by arguing that the IMAs and letter agreements contain reliance disclaimer provisions that purportedly disclaim Gramercy's role in providing tax advice. *See* Appellant Br. at 19-20. But, as the Supreme Court of Texas teaches, for jurisdictional purposes, courts must focus on the physical contacts of the parties and not on the merits of underlying claims or defenses. *Michiana*, 168 S.W.3d at 788-91. These contractual provisions do not diminish the fact that Gramercy did, in fact, discuss the tax advantages and legality of the Investment Strategies with Appellees in Texas. *E.g.,* CR 427-29, 1108-1111, 1115, 1124-26, 2086-90, 2100. Moreover, if the IMAs and letter agreements are going to be a focus at trial (as Gramercy contends), the fact that Gramercy brought the agreements to Texas and discussed them with Appellees is a jurisdictional contact substantially related to the operative facts of the litigation. CR 429-30, 1111, 1126, 2089-90. Additionally, Appellees have a claim to rescind these agreements, thus, the agreements will be substantially involved at trial. CR 196-97.

A substantial connection exists between the Gramercy's statements at Texas meetings and the claims in this case even if Gramercy had never discussed or been involved in the technical "tax code" aspects of the transaction (although, the previously-discussed facts show that it did). *See e.g.,* CR 427-29, 1108-1111, 1115, 1124-26, 2086-2090, 2100. For example, Gramercy misrepresented the potential

42

profitability of the distressed debt assets used in the Investment Strategies, which was part and parcel of convincing Appellees that the transactions had the necessary "economic substance" to support the claimed tax treatment. *See* CR 1115, 2100. According to De Castro West—one of the law firms that Gramercy and BDO touted to Appellees —in order for the Investment Strategies to have been viable, they had to have "economic substance," or a reasonable possibility of profit without regard to tax avoidance. CR 1008-1105 (at VANN0004659-68). Gramercy represented to Appellees that the Investment Strategies had such economic substance, both at meetings in Texas and in statements to the law firms who authored legal opinion letters concerning the Investment Strategies. *See* CR 1008-1105 (at VANN0004620), 1115, 2100. Indeed, Lowry and Vannaman specifically asked Gramercy's Johnston about the profit potential of some of the distressed debt assets at a meeting in Houston in 2003. CR 1115, 2100. According to Lowry and Vannaman,

> Johnston said that the assets were Russian utility receivables and that he had personally been to Russian to investigate the investment and had the collection program under control . . . [and] . . . *repeatedly assured [Vannaman and Lowry] that Gramercy's debt collection efforts on these utility receivables were genuine and that the assets could produce a positive return on investment above and beyond the tax savings*.

*Id.* (emphasis added). Similarly, one of De Castro West's legal opinion letters for the 2004 Distressed Debt Strategy states,

43

[b]ased on the investment information provided by [Gramercy Asset Management LLC] as to the profitability of the Notes reaching certain price levels at which they would be profitable, [L-Falling Creek LLC] believed, and continues to believe, that [L-Falling Creek LLC] has, and will continue to have, a reasonable opportunity to earn a significant economic profit from the Transactions in excess of all fees and transaction costs and without regard to tax benefits.

1008-1105 (at VANN0004620). Thus, even if Gramercy never uttered the magic word "tax" in communications with Appellees (which it did numerous times) Gramercy's contacts with Texas still substantially relate to Appellees' claims.

## C. Gramercy drafted, negotiated, and entered into numerous contracts with Texas-resident Appellees contemplating a long-term relationship with performance occurring at least in part in Texas

Through face-to-face meetings and other communications, Gramercy drafted, negotiated, and entered into numerous contracts with Texas-resident Appellees contemplating a long-term relationship with performance occurring at least in part in Texas. *See, e.g.,* CR 2089-91, 2096, 2098, 2100-2103, 2126-2201, 2208-2318, 2370-72, 2374-75, 2378-2682, 2841-2923, 3077-3204, 3207-3464. A nonresident can be subject to personal jurisdiction when a contract formed between the resident and nonresident "contemplates a long-term agreement." *Smart Call, L.L.C. v. Genio Mobile*, 349 S.W.3d 755, 762 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Likewise, a contract "may establish sufficient minimum contacts when considered against the backdrop of prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Citrin*,

305 S.W.3d at 281 (citing *Burger King v. Rudzewicz*, 471 U.S. at 478-79) (internal quotations omitted). Contrary to Gramercy's contention, accepting payments from a Texas resident under the terms of a contract, while not determinative, is a factor for personal jurisdiction purposes. *Am. Preferred Servs., Inc. v. Harrison*, No. 07-11-0065-CV, 2011 WL 4485463, at *1-2 (Tex. App.—Amarillo Sept. 28, 2011, no pet.). And a choice of law clause is not dispositive in determining whether a forum state has personal jurisdiction over a nonresident. *Citrin*, 305 S.W.3d at 282.

This case is significantly different from the single, out-of-state sale situation presented by *Michiana*. 168 S.W.3d at 786-88. Here, Gramercy drafted, negotiated, and entered into numerous contracts with Appellees over a multi-year period. *See, e.g.,* CR 2089-91, 2096, 2098, 2100-2103, 2126-2201, 2208-2318, 2370-72, 2374-75, 2378-2682, 2841-2923, 3077-3204, 3207-3464. Gramercy presented some of the draft contracts—including the 2000 IMAs, letter agreements, and ITAs—at face-to-face meetings in Texas. *See, e.g.,* CR 429-30, 1111-12, 1114, 1126, 2089-90, 2098. Gramercy presented other draft agreements, such as the 2000 IPAs and 2003 IMAs, to Appellees' representative in Texas via fax or email. CR 2090-91, 2095-96, 2100-03. Just as in *Citrin*, Gramercy also negotiated and discussed the various agreements in phone calls and emails directed to Appellees' representative in Texas. *Id.* Gramercy sent final versions of the agreements to Texas intending for Appellees to sign and return them. CR 2090-91, 2095-96, 2100-03.

45

The terms of the agreements contemplated a long-term relationship between the parties with performance occurring at least in part in Texas. *See, e.g.,* CR 2089-91, 2096, 2098, 2100-2103, 2126-2201, 2208-2318, 2370-72, 2374-75, 2378-2682, 2841-2923, 3077-3204, 3207-3464. For instance, the 2000 and 2003 IMAs required Gramercy to provide periodic account updates. CR 2136-2201, 3085-3204. The IMAs also contained notice requirements that obligated Gramercy to make all necessary communications directly to Appellees in Texas. *E.g.,* CR 2143. The course of conduct between Gramercy and Appellees indicates that required notices from Gramercy were, in fact, sent to Appellees or Appellees' representative in Texas. CR 434, 1116, 1130, 2098, 2099-2101, 2103-04. Gramercy communicated with Appellees and Appellees' representative in Texas over a long period of time to structure and implement the Investment Strategies. *See, e.g.,* CR 2090-2104. The IMAs appointed Gramercy Advisors (in the 2000 IMAs) and Gramercy Asset Management (in the 2003 IMAs) as attorneys-in-fact for Investment LLCs. *See, e.g.,* CR 2137, 3086. As attorneys-in-face for Texas-resident Appellees, Gramercy drafted, negotiated, and entered into transactional agreements necessary to carry out the Investment Strategies, including subscription agreements, assignment and assumption agreements, 2000 IPAs, ITAs, 2003 ITAs, contribution agreements, and operating agreements. *See, e.g.,* CR 2089-91, 2096, 2098, 2100-2103, 2126-2201, 2208-2318, 2370-72, 2374-75, 2378-2682, 2841-2923, 3077-3204, 3207-3464.

46

Many of these agreements contained similar notice requirements. *See, e.g., 2391,* 2851, 3357.

Other contractual terms as well as the parties' course of conduct similarly illustrate a long-term, Texas-connected relationship between Appellees and Gramercy. *See* CR 2136-2201, 3085-3204. The 2000 and 2003 IMAs required the Investment LLCs to contribute large sums of money to Gramercy or Gramercy-run entities. CR 2090, 2101; *see also, e.g.,* CR 2137, 3086. Gramercy sent requests for these payments to Appellees in Texas and accepted payments from Texas bank accounts. CR 2089-90, 2101. Gramercy helped convert some of the entities involved in the 2004 Distressed Debt Strategy to Texas LLCs. CR 2103.

When the IRS began audit proceedings against Appellees, Gramercy received an audit notice concerning LMC. CR 2105, 3556-60. Gramercy faxed this audit notice to Appellees in Texas. *Id.* Gramercy aided Appellees in the audit by wiring payments from LMC's Gramercy-controlled bank accounts to Chamberlain Hrdlicka to pay the legal bill associated with the audit. CR 929-31, 2106. Gramercy, as manager of LMC, also paid Baker Hostetler, a Texas law firm, for work related to the Investment Strategies. CR 2106, 3583-84.

Gramercy touts the fact that the IMAs contained New York choice of law provisions. Appellant Br. at 5. But choice of law provisions are "not dispositive" and can be outweighed by other Texas-centered contacts. *Citrin*, 305 S.W.3d at 282-

47

84. For example, in *Citrin* the exercise of personal jurisdiction was proper, despite the existence of a New York choice of law provision, because (1) the contract was negotiated and consummated in Texas, (2) the contract contemplated an "ongoing business relationship to be performed at least in part in Texas," and (3) the nonresident made misrepresentations concerning the business relationship during meetings in Texas and in faxes, emails, and mail sent to Texas. *Id.* As in *Citrin*, Gramercy's purposeful contacts with Texas outweigh the New York choice of law provision contained in the IMAs. *Id.* Moreover, Appellees seek to rescind those agreements. CR 196-97.

D. **Gramercy directed preparation of tax documents related to the Investment Strategies and delivered the documents to Texas**

As the manager of Appellee-owned LMC, Gramercy retained BDO and FSG to prepare LMC's tax returns and corresponding K-1s containing the tax losses generated by the Investment Strategies for tax years 2000-2005. CR 138, 149, 156, 165, 861-71, 2092-93, 2096-2100, 2103-04. This accounting work was essential to the Investment Strategies and, importantly, contained fraudulent misrepresentations by Gramercy, BDO, and FSG concerning the proper tax treatment of the tax losses generated by the Investment Strategies. *See id.* The K-1s prepared by FSG and BDO, with Gramercy's input, directed Appellees to claim the purported losses on their individual tax returns. *Id.* Without the partnership returns establishing the

losses and the K-1s reflecting those losses, the Investment Strategies would have had no tax impact. *Id.*

Gramercy provided significant guidance to BDO on how to prepare the tax returns and K-1s, even telling BDO what tax forms to fill out. CR 1275-80. Gramercy similarly directed FSG's preparation on tax documents related to the Investment Strategies. CR 846-47, 851-52, 856-60, 872-73. The level of guidance that Gramercy provided the accountants went well beyond "transmit[ting] raw financial information," as Gramercy claims. Appellant Br. at 27-28.

Gramercy mailed many of these tax returns and K-1s to Appellees in Texas, and on at least one occasion hand-delivered the tax returns and K-1s to Texas:

- For the 2000 and 2001 tax years, Gramercy communicated with Appellees at a meeting in Texas about the timing of the tax returns and then had BDO deliver the returns and K-1s to Appellees from BDO's Houston office. CR 2092-93, 2096-97. This constitutes a jurisdictional contact even though Gramercy used BDO as an intermediary to deliver the tax documents. *Harrison*, 2011 WL 4485463, at *2 (acts of intermediary attributable to nonresident defendant for jurisdictional purposes).

- For the 2002 tax year, Gramercy delivered the FSG-prepared tax return and K-1s directly to Appellees' representative in Texas. CR 2098.

- For the 2003, Gramercy hand-delivered the preliminary K-1s to Appellees at a meeting in Texas. CR 2099-2100. It later mailed the final return and K-1s to Appellees' representative in Texas. CR 2099-2100, 2103.

- For the 2004 tax year, Gramercy mailed the final K-1s directly to Appellees in Texas. CR 434, 1116, 1130, 2103-04, 3465-3536. Gramercy included a cover letter with the 2004 tax documents containing multiple paragraphs about tax shelter laws. CR 3531-36. The actual tax returns and K-1s for 2004 included a disclosure that Gramercy Advisors LLC had "promoted, solicited,

49

or recommended [Appellees' participation] in the transaction, or provided tax advice related to the transaction." *See, e.g.,* CR 3474.

**E.    Gramercy made millions of dollars from its Texas contacts through fees generated by the investment management agreements and undisclosed kick-backs from BDO**

Gramercy profited from its purposeful actions in Texas through the 2000 and 2003 IMAs and through undisclosed kick-backs derived from consulting fees paid by Appellees to BDO.  CR 103-04.  In analyzing purposeful availment, courts consider whether the nonresident defendant sought a "benefit, advantage, or profit by availing itself of Texas."  *Max Protetch*, 340 S.W.3d at 887 (asserting personal jurisdiction over nonresident where the nonresident received $65,000 in payments from the Texas-resident plaintiff under a contract); *Moncrief*, 414 S.W.3d at 151.

Gramercy profited from the management fees and incentive fees it received from the Texas-resident Appellees under the 2000 and 2003 IMAs.  *See* CR 2138, 2149, 2160, 2171, 2182, 2193, 3085-3204.  Gramercy took its management and incentive fees from the $4,000,000 related to the first phase of the Investment Strategy and $750,000 related to the second phase as well as millions of dollars invested in the non-tax advantaged investments.  *See* CR 2090, 2094, 2101.

Gramercy also profited significantly from Texas through the undisclosed kick-backs it received from BDO related to Appellees' Investment Strategies.  CR 103-04, 1281-1283, 1890-1902, 2077-82.  Gramercy received these kick-back payments from a portion of the consulting fees that Appellees had paid BDO.  *See*

50

*id.*  In total, Gramercy was paid $2,985,000 by BDO related to Appellees' Investment Strategies.  CR 2074-75, 2077-82.  Gramercy did not receive these payments based on a mere "collateral relation to the forum state," as was the case in *Michiana*.  168 S.W.3d at 788.  Rather, Gramercy received these kick-back payments for successfully marketing and selling the Investment Strategies to Appellees in Texas.  In this way, the money is directly related to Gramercy's constitutionally cognizable contacts with Texas.

Gramercy tries to obscure the relevance of the kick-backs payments by claiming that BDO paid the money to Gramercy Financial Products LLC—an entity not party to this lawsuit.  Appellant Br. at 29 n.16.  Gramercy fails to mention, however, that the invoices to BDO for the kick-backs were sent by Defendant Jay Johnston on Gramercy Advisor's letterhead.   CR 2077-82.  Regardless of which Gramercy entity eventually ended up with the kick-back money, it was Gramercy Advisors and Johnston that invoiced the money.  *See id.*  Thus, those Defendants benefitted from the kick-backs.

### F. Gramercy communicated regularly with Appellees in sent monthly account statements to Appellees in Texas, set up a secure website for Appellees to view account information, and invited Appellees to participate in quarterly conference calls from Texas

Gramercy sent regular, monthly account statements to Appellees in Texas, set up a secure website for Appellees to view account information, and invited Appellees to participate in quarterly conference calls from Texas.  CR 43, 279, 1116,

1130, 2105, 3638-39, 3641. Regular mailings and phone calls by a nonresident into a forum state are relevant for jurisdictional purposes. *Cartlidge v. Hernandez*, 9 S.W.3d 341, 348 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *Peters v. Top Gun Executive Group*, 396 S.W.3d 57, 69-71 (Tex. App.—Houston [14th Dist.] 2013, no pet.) Additionally, maintaining an interactive website accessible by forum residents is a factor for jurisdictional purposes. *Daimler-Benz A.G. v. Olson*, 21 S.W.3d 707, 725 (Tex. App.—Austin 2000, pet dism'd). In Texas, the quality and nature of website contacts are evaluated on a sliding scale. *Id.*

Although the account statements and email "flash" previews do not, on their face, mention the Investment Strategies, the statements and previews are connected to the Investment Strategies in two ways. First, the investment returns shown on the statements are related to non-tax advantaged investments that Gramercy told Appellees would help strengthen the position of their tax-advantaged investments. CR 2088-89, 2104-05. Second, the statements concern the very entities that Gramercy used to implement the Investment Strategies—including LMC, MPICS, SGASSI, DSAMP, WAINKR, STKEE, and RDICTD. CR 434-45, 1116, 1118-21, 1130-35, 2105, 3542-55. In addition to the mail and email communications, Gramercy used a secure website to communicate account activity to Appellees. CR 2105. In this way, Gramercy's website went beyond a purely passive website meant

52

to advertise to the general public and is thus relevant for jurisdictional purposes. *Olson*, 21 S.W.3d at 725.

Gramercy, usually through its employee Scott Seaman, also invited Appellees to participate in quarterly conference calls related to the non-tax advantaged investments that were used to strengthen the position of Appellees' tax-advantaged investments. CR 2105. Appellees' representative, Newt Vannaman, participated in many of these conference calls from Texas. *Id.*

### G. Gramercy managed entities—majority owned by Texans—involved in the Investment Strategies

Gramercy managed many of the entities—majority owned by Texans—that were involved in the Investment Strategies. Participating as a manager, officer, or director of a Texas-based entity can subject a nonresident to jurisdiction in Texas. *TexVa, Inc. v. Boone*, 300 S.W.3d 879, 888 (Tex. App.—Dallas 2009, pet. denied). For the years 2000 to 2004, Gramercy was "sole manager" and a member of LMC— a partnership majority-owned by Appellees. CR 1226-66. Gramercy was also "sole manager" of MPICS, RDICTD, and SGASSI—the entities involved in the 2004 and 2005 Investment Strategies and majority-owned by Appellees. CR 1729-70, 1781-1822, 1833-74. Gramercy-controlled entities owned membership interests in other entities involved in the 2004 and 2005 Investment Strategies. CR 1729-70, 1781-1822, 1833-74, 3221-3346. For example, EROSE and Defendant Gramercy Asset Management collectively owned over 10% of DSAMP (CR 3304), WAINKR (CR

53

3262), and STKEE (CR 3346).  Gramercy Asset Management also owned 1.1% of MPICS (CR 1770), SGASSI (CR 1822), and RDICTD (CR 1874).

Gramercy reached out to Texas by selling Texas-resident Appellees various partnership interests and distressed debt assets that were involved in the Investment Strategies.  Gramercy sold interests in LMC to Appellees through subscription agreements in 2000.  CR 130, 2091, 2208-2299.  Gramercy sent these subscription agreements to Texas for Appellees' signatures.  CR 2091.  The subscription agreements included Texas addresses for the Investment LLCs and also included home addresses for the individual Appellees. *See, e.g,* CR 2215-16.  Gramercy knew it was selling part of LMC to Texas residents. *See id.*  Gramercy sold Appellees distressed debt assets through interest purchase agreements and interest transfer agreements, which agreements Gramercy drafted and sent to Appellees in Texas for their signatures.  CR 1300-90, 1488-1590, 1601-1718, 2378-2682, 2841-2923, 3347-3436.  These agreements, likewise, listed Texas addresses for the Investment LLCs. *See, e,g.*, CR 1313.

**III.** **The cases cited by Gramercy do not apply to this case involving numerous face-to-face meetings in Texas initiated by Gramercy**

Gramercy cites several cases in its Appellant's Brief.[6] But these cases do not apply to the present lawsuit involving numerous Texas meetings initiated by Gramercy at which Gramercy made material misrepresentations Appellees.

Gramercy cites *Griego* to argue that contracting with a Texas resident, accepting fees from a Texas resident, and sending periodic account statements to Texas are insufficient to confer jurisdiction. *See* Appellant Br. at 22, 24, 28-29. The facts here significantly differ from *Griego* for two reasons. First, unlike here, the nonresident defendant in *Griego did not* conduct meetings in Texas to market and implement the transactions at issue in the case. 221 S.W.3d at 596-99. Second, unlike here, in *Griego* the nonresident defendant was not involved in the formation of the business transaction at issue in the dispute. *Harrison*, 2011 WL 4485463 at *3-5 (Pirtle J. concurring) (distinguishing *Griego*). Here, as cited extensively above, Gramercy co-directed the deal from start to finish.

_____

[6] Gramercy relies heavily on *IRA Res., Inc. v. Griego*, 221 S.W.3d 592 (Tex. 2007) and *Proskauer Rose LLP v. Pelican Trading, Inc.*, 2009 WL 242993 (Tex. App.—Houston [14th Dist] Feb. 3, 2009, no pet.)). Gramercy also cites *Farwah v. Prosperous Mar. Corp.*, 220 S.W.3d 585, 597 (Tex. App.—Beaumont 2007, no pet.), *Gustafson v. Provider HealthNet Servs., Inc.*, 118 S.W.3d 479 (Tex. App.—Dallas 2003, no pet.), *Marathon Oil v. A.G. Ruhrgas*, 182 F.3d 291, 295 (5th Cir. 1999), *Turan v. Universal Plan Inv. Ltd.*, 70 F. Supp. 2d 671, 674 (E.D. La. 1999), *Bozell Grp., Inc. v. Carpet Co-op of Am. Ass'n, Inc.*, No. 00 CIV. 1248, 2000 WL 1523282, at *7 (S.D.N.Y. Oct. 11, 2000), *Hotel Partners v. Craig*, 993 S.W.2d 116 (Tex. App.—Dallas 1998, pet. denied), *Lang v. Capital Res. Investments, I, LLC*, 102 S.W.3d 861, 866 (Tex. App.—Dallas 2003, no pet.), and *Magnolia Gas Co. v. Knight Equip. & Mfg. Corp.*, 994 S.W.2d 684, 688, 691 (Tex. App.—San Antonio 1998).

Gramercy cites *Proskauer* and argues that the facts and reasoning apply equally here. *See* Appellant Br. at 22, 33. Although *Proskauer* concerns a similar abusive tax shelter, Gramercy's contacts with Texas here are much more substantial than the law firm's jurisdictional contacts in *Proskauer*. 2009 WL 242993 at *1-3. In *Proskauer*, the nonresident law firm did not conduct meetings in Texas to market its services. *Id.* In fact, the law firm never met with plaintiffs in Texas. *Id.* The law firm's contacts with Texas were limited to five emails and a letter to the plaintiffs. *Id.* at *3. And as mentioned above, Gramercy met with Plaintiffs in Texas nine times and was involved in all stages of the Investment Strategies; it didn't just merely issue a legal opinion.

Finally, Gramercy cites *Farwah, Gustafson*, *Marathon Oil*, *Turan*, *Bozell, Hotel Partners*, and *Lang* to argue that meetings in Texas unrelated to the subject matter of the case are not sufficient for personal jurisdiction purposes. Appellant Br. at 17-21. These cases, however, are a straw man because, as alleged in the Petition and supported by the record, Gramercy voluntarily came to Texas to discuss the Investment Strategies and made numerous misrepresentations at those meetings. CR 120-22, 320-21, 427-29, 431-33, 1108-10, 1112-16, 1124-25, 1127-29, 2086-88, 2092-2100, 2104-05, 3701-02. The subject matter of those meetings is directly related to this lawsuit. *Id.*

Additionally, Gramercy cites *Magnolia Gas* to argue that an in-state meeting initiated by someone other than the nonresident defendant is not sufficient to confer jurisdiction. Appellant Br. at 21. Gramercy's argument is contrary to the Texas Supreme Court's more-recent holding in *Moncrief*, where the court found it sufficient that Gazprom simply "agreed to attend Texas meetings." 414 S.W.3d at 153. In any event, here, Appellees have abundant testimony and evidence showing that Gramercy initiated at least some of the Texas meetings and agreed to conduct the other meetings in Texas. *See, e.g.,* CR 2086-87, 2093, 2349-52, 2361-62.

## IV. Exercising personal jurisdiction over Gramercy will not offend traditional notions of fair play and substantial justice

Exercising personal jurisdiction over Gramercy will not offend traditional notions of fair play and substantial justice. First, the burden on Gramercy to defend against Appellees' claims in Texas is slight compared to the millions of dollars it made from the Investment Strategies and other Texas clients. CR 103-04, 1281-83, 1890-1902, 2074-76. "Distance to travel is generally not a significant consideration due to modern transportation." *Citrin*, 305 S.W.3d at 288. The Texas Supreme Court recently held that subjecting a Russian company to jurisdiction in Texas did not offend traditional notions of fair play and substantial justice. *Moncrief*, 414 S.W.3d at 154-56. Based on the numerous visits Gramercy made to Texas and the millions of dollars Gramercy made from the Investment Strategies, Gramercy should not be surprised to be haled into a Texas court.

Second, Texas has a significant interest in providing a convenient forum to its citizens to redress torts allegedly committed in whole or in part in Texas. *Moncrief*, 414 S.W.3d at 155. Third, Appellees have an equally important interest in adjudicating the dispute where the injuries occurred and in a forum where all parties to the scheme can be joined together. *Id.* Fourth, the interstate judicial system will benefit from a trial in Texas. *Id.* If the Court severs Gramercy from this lawsuit, Appellees will be forced to sue Gramercy in another forum without the benefits of efficient party-discovery from the other Defendants. It is far more efficient to try this lawsuit with all Defendants in one forum and in a location where many of the witnesses—including Appellees, Vannaman, and Moorman—are located.

## CONCLUSION AND PRAYER

There is legally and factually sufficient evidencing showing a substantial connection between Gramercy's numerous contacts with Texas and the operative facts of the litigation. Gramercy met with Appellees in Texas on numerous occasions to market, sell, and implement the Investment Strategies at issue in this case. The record shows that Gramercy made misrepresentations concerning the Investment Strategies at those meetings. Those meetings alone should subject Gramercy to jurisdiction in Texas. Gramercy's other numerous contacts with Texas are also substantially connected to the Investment Strategies.

As a result, this Court should affirm the order denying Gramercy's Special

Appearance.  Appellees also ask for all other relief to which they are entitled.

Respectfully submitted,

LOEWINSOHN FLEGLE DEARY, LLP


*/s/ Tyler M. Simpson*
DAVID R. DEARY
Texas Bar No. 05624900
W. RALPH CANADA, JR.
Texas Bar No. 03733800
WILSON E. WRAY
Texas Bar No. 00797700
TYLER M. SIMPSON
Texas Bar No. 24066061
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 - Telephone
(214) 572-1717 – Facsimile

**ATTORNEYS FOR APPELLEES**

## CERTIFICATE OF COMPLIANCE

I certify that this document was produced on a computer using Microsoft Word 2013 and contains 13,548 words, as determined by the computer software's word-count function, excluding the sections of the document listed in Texas Rule of Appellate Procedure 9.4(i)(1).

This brief complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) because it contains Times New Roman typeface in 14 point (12 point in footnotes).

*/s/ Tyler M. Simpson*
Tyler M. Simpson

## CERTIFICATE OF SERVICE

As required by Texas Rule of Appellate Procedure 6.3 and 9.5(b), (d), (e), I

certify that I have served this document on all parties, which are listed below, on

March 5, 2015 as follows:

David C. Mattka (lead attorney)                    *via e-filing and email*
MUNSCH HARDT KOPF & HARR, P.C.
401 Congress Avenue, Suite 3050
Austin, Texas 78701
(512) 391-6100 (telephone)
(512) 391-6149 (fax)
dmattka@munsch.com

Sean O'Shea (*pro hav vice*)                       *via e-filing and email*
Michael E. Petrella (*pro hav vice*)
Daniel M. Hibshoosh (*pro hav vice*)
O'SHEA PARTNERS LLP
521 Fifth Avenue, 25th Floor
New York, New York 10175
(212) 682-4426 (telephone)
(212) 682-4437 (fax)


                                           */s/ Tyler M. Simpson*
                                           Tyler M. Simpson